THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MIKE PELLER and ABRAHAM PODINKER, Appellants.

Reargued October 13, 1943; decided December 8, 1943.

*Harry G. Anderson* and *Samuel Bader* for Mike Peller, Appellant. There was insufficient evidence as matter of law to corroborate the testimony of the accomplice Popek. (*People* v. *Kress,* 284 N. Y. 452; *People* v. *Vaccaro,* 288 N. Y. 170; *People* v. *Ryan,* 263 N. Y. 298; *People* v. *Storrs,* 207 N. Y. 147; *People* v. *McQuade,* 110 N. Y. 284; *People ex rel. State* v. *Davis,* 56 N. Y. 95; *People* v. *De Paulo,* 235 N. Y. 39; *People* v. *Page,* 162 N. Y. 272; *People* v. *Weiss,* 290 N. Y. 160; *People* v. *Marendi,* 213 N. Y. 600; *People* v. *Cascone,* 185 N. Y. 317; *People* v. *Koerner,* 154 N. Y. 355; *People* v. *Smith,* 172 N. Y. 210.) The verdict is against the weight of the evidence. (*People* v. *Crum,* 272 N. Y. 348; *People* v. *Davino,* 284 N. Y. 486; *State* v. *Fong Loon,* 29 Idaho 70; *Wilson* v. *United States,* 232 U. S. 563; *People* v. *Webster,* 139 N. Y. 73; *People* v. *Florina,* 232 N. Y. 545; *People* v. *Reddy,* 261 N. Y. 479; *People* v. *Feolo,* 284 N. Y. 381; *People* v. *Weiss,* 290 N. Y. 160; *People* v. *Page,* 162 N. Y. 272; *People* v. *De Paulo,* 235 N. Y. 39; *People* v. *Cascone,* 185 N. Y. 317; *People*

v. *Nitzberg,* 287 N. Y. 183, 289 N. Y. 523; *People* v. *Buchalter,* 289 N. Y. 181; *People* v. *Goldstein,* 285 N. Y. 376.) The trial court committed reversible error in receiving as against appellant Peller testimony of admissions made by the alleged conspirators Popek and Podinker in Peller's absence and after the termination of the conspiracy. (*People* v. *Vaccaro,* 288 N. Y. 170; *People* v. *Ryan,* 263 N. Y. 298; *People* v. *Storrs,* 207 N. Y. 147; *People* v. *McQuade,* 110 N. Y. 284; *People* v. *Davis,* 56 N. Y. 95.) The trial court committed reversible error in receiving in evidence Lieberman's testimony as to a conversation with Peller and permitting the jury to accept such testimony as corroborative of the testimony of the accomplice. (*People* v. *Kress,* 284 N. Y. 452; *People* v. *Maione,* 284 N. Y. 423.)

*James D. C. Murray* and *Daniel Kirchman* for Abraham Podinker, appellant. The guilt of the defendant Podinker was not established beyond a reasonable doubt. (*People* v. *Cohen,* 223 N. Y. 406; *Winston* v. *Winston,* 165 N. Y. 553; *State* v. *Fong Loon,* 29 Idaho 70; *Wilson* v. *United States,* 232 U. S. 563; *People* v. *Webster,* 139 N. Y. 73; *People* v. *Davino,* 288 N. Y. 423; *People* v. *Reddy,* 261 N. Y. 479; *People* v. *Feolo,* 284 N. Y. 381; *People* v. *Kress,* 284 N. Y. 452; *People* v. *Florina,* 232 N. Y. 545; *People* v. *Becker,* 210 N. Y. 274; *People* v. *Nitzberg,* 289 N. Y. 523.) The substantial rights of defendant Podinker were impaired by the introduction of prejudicial testimony. (*People* v. *Zackowitz,* 254 N. Y. 192; *People* v. *Thau,* 219 N. Y. 39; *People* v. *Grutz,* 212 N. Y. 72; *People* v. *Thompson,* 212 N. Y. 249; *People* v. *Manganaro,* 218 N. Y. 9; *People* v. *Slover,* 232 N. Y. 264.)

*Frank S. Hogan, District Attorney* (*Stanley H. Fuld* and *Richard G. Denzer* of counsel), for respondent. The guilt of the defendants was proved beyond a reasonable doubt. (*People* v. *Nitzberg,* 287 N. Y. 183; *People* v. *Goldstein,* 285 N. Y. 376; *People* v. *Kress,* 284 N. Y. 452; *People* v. *Cohen,* 223 N. Y. 406; *People* v. *Hoogkerk,* 96 N. Y. 149; *People* v. *Reddy,* 261 N. Y. 479; *People* v. *Dixon,* 231 N. Y. 111.) There was ample evidence corroborating Popek's testimony that Podinker participated in the commission of the crime. (*People* v. *Deitsch,* 237 N. Y. 300; *People* v. *Gorski,* 236 N. Y. 673; *People* v. *Lewis,* 136 Cal. App. 405; *People* v. *Lomars,* 288 N. Y. 645; *People* v. *Jackson,* 182

N. Y. 66; *People* v. *Birnbaum,* 208 App. Div. 476; *Wilson* v. *United States,* 162 U. S. 613.) There was ample evidence corroborating Popek's testimony that Peller participated in the commission of the crime. (*People* v. *Wagner,* 180 N. Y. 58; *Stokes* v. *People,* 53 N. Y. 164; *People* v. *Kennedy,* 32 N. Y. 141; *Jewett* v. *Banning,* 21 N. Y. 27; *People* v. *Whitlock,* 187 App. Div. 863; *People* v. *Vitusky,* 155 App. Div. 139; *People* v. *Stilwell,* 244 N. Y. 196; *People* v. *Meehan,* 256 App. Div. 268; *Dockerty* v. *People,* 96 Col. 338; *People* v. *Burbank,* 234 Mich. 600; *People* v. *Reddy,* 261 N. Y. 479; *People* v. *Dixon,* 231 N. Y. 111.) A conviction is not to be disturbed simply because it is supported by testimony of " bad men," and that the credibility of criminals is a question for the jury. (*People* v. *Buchalter,* 289 N. Y. 181; *People* v. *Goldstein,* 285 N. Y. 376; *People* v. *Arata,* 255 N. Y. 374; *People* v. *Cohen,* 223 N. Y. 406; *People* v. *Becker,* 215 N. Y. 126; *People* v. *Seidenshner,* 210 N. Y. 341; *People* v. *Driscoll,* 107 N. Y. 414.) The testimony of Newburg and Lieberman concerning their conversations with the defendants and Popek was properly admitted. (*People* v. *Snyder,* 246 N. Y. 491; *People* v. *McCarthy,* 256 App. Div. 522; *People* v. *Doran,* 246 N. Y. 409; *People* v. *Emieleta,* 238 N. Y. 158; *People* v. *Semione,* 235 N. Y. 44; *People* v. *Krassner,* 241 App. Div. 741, 265 N. Y. 470; *People* v. *Patrick,* 182 N. Y. 131; *People* v. *Jacobs,* 158 App. Div. 293; *Lancaster* v. *State,* 21 Ala. App. 140; *People* v. *Dixon,* 231 N. Y. 111; *People* v. *McCallam,* 3 N. Y. Cr. Rep. 189, 103 N. Y. 587.)

THACHER, J. The appellants, Peller and Podinker, appeal to this court from a judgment of death entered upon their convictions of the crime of murder in the first degree.

On the evening of September 6, 1928, the body of Jacob Weinberg was found in the cellar areaway of 166 Suffolk Street in the city of New York. Death had been caused by one of four bullets which were found in the deceased's head. In March 1942, the appellants were indicted, together with David Popek, for Weinberg's murder. At the trial Popek testified for the People and his testimony, corroborated by the testimony of Sidney Newburg and Jack Lieberman, constituted the chief basis for the verdict of guilt.

Popek had been previously convicted of nine different crimes. He testified that, a few days before the killing, he had been in

the company of the two appellants in Peller's apartment, where all three were smoking opium. In the course of conversation Peller, a dealer in narcotics, remarked that he was having "trouble" with one of the men who used to work for him, whereupon Podinker volunteered "to take care of it any time you say so". Peller deferred decision for the time being, and on the next day all three again met in Peller's apartment. On that occasion, Peller declared that Weinberg (the deceased) had been stealing his opium customers and told both Popek and Podinker that if they would "take care of that" he would turn certain opium business over to them. Podinker then promised that Weinberg would be killed whenever Peller would "say the word." On the next day, which was September 5, 1928, both Popek and Podinker set out to find a building with two exits so that they could "go in one way and come out another way." The building at 166 Suffolk Street was then chosen.

All three then met again in Peller's home on September 6th, where Peller instructed Popek and Podinker to kill Weinberg "right away." That evening the deceased was lured into the cellar of the building, where Podinker killed the deceased with a revolver borrowed for the purpose by Popek. Popek and Podinker then made their exit through the rear of the building and proceeded to Peller's apartment where they told him what they had done.

Two witnesses — Lieberman and Newburg — were called to corroborate the accomplice, Popek. These three witnesses, upon whose testimony the convictions in this case depend, were of the most disreputable character and there is little to choose among them. The jury would have been entirely justified in rejecting their testimony as unworthy of belief. Their testimony was opposed only by denials of the defendants, whose characters, associations and activities were no better than those of their former associates who testified against them. Thus the case turned upon credibility of oral testimony of highly questionable quality which was in irreconcilable conflict. By its verdict the jury has given credence to the People's witnesses and has rejected the defendants' denials.

Was the testimony of the accomplice corroborated by other evidence which tended to connect the defendant with the commission of the crime? (Code Crim. Pro. § 399.) If there was

such corroboration, was the verdict against the weight of the evidence? (Code Crim. Pro. § 528.) If there was corroboration and the verdict was not against the weight of the evidence, was the verdict of the jury influenced by errors which may not be disregarded, though no exceptions were taken, and which are of such a character as to require a new trial in the interest of justice? (Code Crim. Pro. § 528.) These are the questions which confront us.

Upon the preliminary question we are not concerned with credibility at all. The statutory test is whether the evidence offered in corroboration has a tendency to connect the defendant with the commission of the crime, and the testimony of a thoroughly discredited witness to an oral admission of the accused, having a tendency to connect him with the commission of the crime, is sufficient corroboration to meet the statutory requirement. (*People* v. *Buchalter*, 289 N. Y. 181.) Lieberman's testimony directly connected the defendant Podinker with the commission of the crime, for he testified that he saw Jocko (the deceased) on Suffolk Street at about eight o'clock in the evening of the day of the murder in the company of Popek and Podinker. He testified: " I said, ' Hello, Jocko, I want to see you,' * * * He told me, ' I will be right back.' * * * he wasn't alone. * * * He was with David Popek and Schtunky [Podinker]. Q. And when he said that he would see you in a minute, what happened — now, go ahead and tell us. A. Oh, I seen Jocko and David Popek and Schtunky walk into the hallway of 166 Suffolk Street. * * * After a few — after a minute or a half a minute there, I heard shots. * * * I immediately walked away towards Stanton Street * * * I didn't see anybody coming out of that particular building there but as I walked around the corner there I seen Schtunky and David Popek coming out of a building. Q. Did you see Jocko Weinberg with them? A. No, sir. Q. What did you do then? A. I walked away."

The building the three men entered was where Weinberg's body was found, and the testimony of Lieberman directly corroborated the account of his killing by Podinker in the area at the rear of the building.

Lieberman also testified to a conversation with Podinker and Popek in a restaurant on the evening of the day following

the murder, when Popek told him in the presence of Podinker: "Jocko had it coming to him because he was taking a lot of trade away from Whitey Heller [Peller]", saying he expected Peller to put him and Podinker on the payroll at fifty dollars a week. Lieberman said that Podinker then told Popek to "keep his big mouth shut because everybody knows about it in the neighborhood."

Sidney Newburg also testified that he and Popek and Podinker, three or four days after the murder, went to his apartment in Ridge Street to smoke opium and that they had a conversation relating to Weinberg, that Popek did most of the talking and "he was blaming Whitey for — calling Whitey a few names for only giving him ninety dollars for killing Jocko, and he promised much more, and he said that he would get the rest of it, that Whitey had a ring, and this — and if necessary he would go up and take the ring from him. "Q. And was Podinker present? A. Yes. Q. Did Podinker say anything? A. All he did was chimed in with him. Q. Did he say anything? A. Yes, he made a few remarks about — The Court: Well, what were they? The Witness: I don't remember exactly, but I know that everything that Popek said, that Podinker would say 'Yes,' 'imagine that big son of a bitch. It wasn't worth losing the trade over the money,' and all this and that."

With relation to the defendant Peller, Sidney Newburg testified that about noon on the day Weinberg was killed, September 6, 1928, he came through Norfolk Street on his way to the candy store and Jocko came out of a moving van place next to the store and asked him what he wanted; that he told Weinberg he wanted three, meaning tins of opium. Jocko went back into the moving place and came out with three tins. As he did, Peller came out of the candy store and started "jumping on" Jocko, calling him foul names and saying: "What the hell do you think I am doing, building up a trade for the likes of you around here?" The argument was heated, Jocko insisted that he was not stealing any customers and that it was anybody's trade, to which Peller replied: "This is the last customer of mine you'll ever take." Peller then started "bawling" Newburg "out" for buying from Jocko. Newburg told Peller that he was not responsible for that, that he didn't know

that Jocko wasn't working for Peller, that he didn't come around looking for Jocko, that he came around looking for Peller and thought Jocko was working for him. He left the two men still arguing.

This angry altercation and the remark of Peller, which could only have been intended and understood as a threat, were so closely connected in point of time with the murder of Weinberg as to have a potent tendency to connect Peller with the commission of the crime.

With relation to Peller, Lieberman testified: " Q. Did you ever see Heller after the killing of Jocko Weinberg? A. Oh, I seen him say a few days afterwards. Q. Where did you see him? A. At Stanton and Suffolk Street. Q. Did you talk with him or did he talk with you? A. I spoke to him and he spoke to me. Q. Tell us what was said. A. About ten o'clock in the evening, I don't know when, it was very late in the evening, it was dark at that particular time when Whitey Heller came over to me and asked me if I saw David Popek or Schtunky. I told him I seen them walk towards the restaurant. He asked me whether or not Davel spoke to me with reference to with (*sic*) Jocko. I told him he did. He asked me, ' What did he say? ' ' He says that I, he and Schtunky expect to be put on the payroll by you.' ' What else? ' And I told him that it was a lousy thing to do in reference with Jocko because Jocko was a hell-of-a-nice fellow, he was well liked by a lot of people, and I even told Whitey that he marked himself lousy around the neighborhood by having two other fellows killing Jocko, and I told him if he didn't have guts enough to do it himself there he never should have sent two other people to do it. Q. Did he say anything? A. He told me ' Keep my big mouth shut ' there, and I just walked away from him.''

Peller's response disclosed a state of mind quite inconsistent with innocence. The plain assertion that he had hired two others to do the killing was neither denied nor resented but Lieberman was warned to keep quiet about it. Under the circumstances, Peller's response tended to show his connection with the murder.

Accordingly, we must conclude that there was sufficient corroboration to take the whole case to the jury for its consideration and determination under proper instructions from the court.

In considering the weight of the evidence, as we must under the statute, we are to consider all the testimony and evidence in the record and in so doing may not close our eyes to questions of credibility which may have important bearing upon the question whether the evidence was of such weight as to justify the jury's determination of guilt beyond a reasonable doubt. This inquiry is not one in which we may usurp the function of the jury in determining the question of guilt or innocence and conclude upon our own review of the record that we would not feel justified in reaching the same determination. For we may not set aside the jury's verdict unless we conclude that it is against the weight of the evidence. Here all the witnesses are of the same character — thoroughly discreditable people — convicts, dope peddlers and users of drugs, if not addicts. In such a situation justice requires that decision be left to the jury as the triers of the facts who have seen and heard the witnesses and are most competent, under proper instructions from the court, to determine questions of credibility. Such a situation is clearly distinguishable from a case where witnesses of bad character and ill repute are contradicted by persons of character and of standing in the community. (*People* v. *Crum*, 272 N. Y. 348.) There the court concluded that the jury was not justified in finding the defendant guilty beyond a reasonable doubt.

If the People's witnesses were telling the truth, as the jury found, the verdict was clearly supported by the weight of the evidence. If no errors or defects affect the verdict thus supported, we may not set it aside and grant a new trial. (*People* v. *Buchalter*, 289 N. Y. 181, 230.)

Serious question arises because of the admission of testimony relating to conversations with Podinker and Popek, when Peller was not present, which gravely incriminated Peller. These are the conversations above referred to,— one in the testimony of Lieberman which occurred in a restaurant on the evening of the day following the murder, the other in the testimony of Newburg three or four days after the murder. It was entirely proper to receive this testimony against Podinker, who participated in each conversation, but Peller was entitled to instructions strictly limiting the effect of such testimony to the case against Podinker. Counsel for Peller moved to strike out Newburg's testimony as to the second conversation, but no ruling

was made on this motion and counsel did not press for a ruling. No objection was made or exception taken to Lieberman's testimony as to the earlier conversation. The jury was not told to disregard the testimony in considering the evidence against Peller, and counsel did not request such instructions. This situation requires consideration as to whether " justice requires a new trial ", although no ruling was requested limiting the effect of this testimony so that it should not be regarded as incriminating Peller. We are unable to avoid conviction that the testimony, received without limitation and without instructions that the jury should disregard it in the consideration of the case against Peller, was highly prejudicial and may well have turned the scales against Peller in the jury's consideration of the case. We are led to this conclusion by the importance which this testimony assumed in relation to the theory of the prosecution as explained in the judge's charge. Quite properly, the trial judge emphasized repeatedly the necessity of finding a conspiracy to kill Weinberg in which Popek, Podinker and Peller were engaged. Having thus fixed the attention of the jury upon the alleged conspiracy among the accomplice and the two defendants, the court reviewed the testimony given by the People's witnesses and the testimony given by the defense and in the course of this review recited the conversation which Newburg testified occurred three or four days after the death of Weinberg, when he accompanied Podinker and Popek to his apartment, where Popek said that Peller had given him only ninety dollars for the killing of Jocko and that Peller had promised him much more. Then, referring to all the testimony of Newburg previously summarized, the court continued: " The People assert that this testimony of Newburg's tends to support the testimony of the accomplice Popek inasmuch as, they say, it is tantamount to an admission by Podinker that he shared in the proceeds of the money received for the killing of Weinberg, and that he expected to share in whatever proceeds came from such enterprise, including anything that Popek got from Peller." There was no instruction at this or at any other time that such testimony was not evidence against Peller.

Again, in summarizing Lieberman's testimony to the conversation on the day following the murder, the court said: " Levy

[Lieberman] said on the following day he met Popek and Podinker in a restaurant, and that Popek asked him if he had seen anything the night before and he told him he had not. Levy then said that Popek told him that Weinberg had it coming to him because he had taken a lot of trade from Peller. And Podinker, who was with Popek, said nothing.

"Levy said he again met these same two men in the same restaurant the following night, and Popek again began talking about Weinberg having it coming to him. Popek said, in the presence of Podinker, that he, Popek, expected Peller to put him and Podinker on the payroll for $50 a week."

Again there was no instruction to the jury that these highly incriminating remarks in regard to Peller, picturing him as paymaster of the assassins, should not be considered against Peller himself. A fair trial demanded that such testimony — particularly in a case dependent upon proof of conspiracy — should be submitted to the jury only under careful and proper instructions limiting its effect as the defendant Peller was entitled to have it limited. In the absence of instructions, we may not fairly assume that the jury disregarded this testimony in considering the evidence against Peller; nor may we conclude that testimony so highly prejudicial, if regarded by the jury in considering the case against Peller, did not affect its verdict against him.

We find no error in the record upon which the verdict against Podinker may be set aside. Accordingly, the judgment of conviction of the defendant Podinker should be affirmed, and the judgment of conviction of the defendant Peller should be reversed and a new trial ordered as to him.

LEHMAN, Ch. J., LEWIS and CONWAY, JJ., concur; RIPPEY, J., concurs as to Podinker, but votes to reverse the judgment of conviction and to dismiss the indictment as to Peller on the ground that the evidence is insufficient, as a matter of law, to sustain his conviction beyond a reasonable doubt; LOUGHRAN and DESMOND, JJ., dissent in part in the following memorandum: "If there is to be a new trial here, it should be on the firm ground that the People's witnesses just could not be believed. That requires a new trial for Podinker as well as for Peller, and we so vote."

Judgment accordingly.